**E. Ozean MORRIS, Petitioner,**

v.

**CITY OF OKLAHOMA CITY, State Insurance Fund, and Workers' Compensation Court, Respondents.**

**No. 54387.**

Court of Appeals of Oklahoma, Division 2.

Nov. 4, 1980.

Supplemental Opinion On Denial of Rehearing Jan. 13, 1981.

Certiorari Denied March 2, 1981.

Released for Publication by Order of Court of Appeals March 5, 1981.

Charles E. Payne, Russell, Payne & Farber, Oklahoma City, William O. West, Rice & West, Edmond, for petitioner.

Gary W. Sleeper, State Insurance Fund, Oklahoma City, for respondents.

BRIGHTMIRE, Presiding Judge.

The principal question raised here is whether or not the Workers' Compensation Court was obliged under the evidence to find claimant's mental aberrance was an accidental injury resulting from an on-the-job fall February 20, 1979, and to compel her employer to pay for psychiatric treatment of the condition. The 52-year-old woman, E. Ozean Morris, insists it was and seeks appellate review of an order rejecting her claim.

### I

Morris, a steno-clerk, had worked for the City of Oklahoma City about ten years when she fell down some stairs at work injuring her left ankle, left hip and lower back. She was taken by ambulance to the hospital where she was examined, given medication and released on crutches because of a sprained ankle. The next day her employer sent her to its physician, Jack D. Spencer, M.D. He looked at her ankle but refused to consider her back complaints because of a previous job-related back injury which was the subject of another pending workers' compensation claim.

Without rendering any treatment to her back, Spencer released her for work March 26, 1979. She reported for work but "the pain in the hip and back," she said, "along with the mental stress, . . . caused [me] to go on disability leave," save for an occasional attempt to work.

On April 30, 1979 she filed this claim. Shortly after that she sought medical help from Russell Allen, M.D., who, after examining her, referred her to a physical therapist for treatment. She received this therapy for eight weeks. At this point Russell again examined her, prescribed more therapy and recommended Morris consult a psychiatrist because, as she put it, "the City was giving me so much stress . . . [h]arassing me [and] treating me like a criminal."

The psychiatrist she consulted was Moorman Prosser. He saw her twice, but though he said she needed more of his ther-

apy, she did not go back because the City refused to pay for it and she could not.

At the hearing's end the trial judge found that Morris had compensably injured her left ankle and low back when she fell February 20, 1979 entitling her to temporary total compensation until June 22, 1979.[1] The court further found that "claimant's mental condition is not related to this physical injury," and consequently made no order with respect to related medical expenses, incurred or prospective. Finally, the court reserved "for future hearing" the issue of what permanent disability Morris may have sustained.

Morris' appeal to the court *en banc* was unsuccessful precipitating this review.

## II

To place in proper perspective the propriety of the trial judge's conclusion regarding claimant's mental problem, we should recite some significant segments of her mental and medical history. In the mid-1960's her neck was injured in an automobile wreck. Her upper back was injured when she was thrown from a horse in 1973. In 1976 she fell down seven steps sustaining a coccyx injury and causing, she thought, a bowel problem. During the winter of 1978 she slipped on an icy surface at work and again landed on her tailbone injuring her lower back, ankle and wrist.[2]

Her mental complaints did not begin until after her 1976 fall. "[T]hat's when my problem with the City started," she said. "I had no problems with these people when I fell in 1976 ... I was a good employee ...." It was impossible to understandably express "what the City does to an employee when they have been injured," said the claimant. "They harass you, you don't have the same break privileges as other people."

After the 1976 fall they began to "attack me, [and] each time it got a little worse," she continued. "[T]his time I fell, the

things that they have done to me ... the way they harass you, they make you feel like you are a criminal. They say dirty things to you, they make nasty statements to you about getting your medical bills paid at the City's expense ... and your friends don't speak to you, people are afraid to speak to you, your friends will sneak around ... people who are in sympathy with you, they have called me ... [and told] me that they were ... going to fire me...."

It is apparent that claimant attempted to describe what she conceived to be a contrived plot orchestrated by the municipality to intimidate, harass and humiliate her after her 1976 fall—an effort which continued throughout the course of the next two on-the-job accidents.

## III

An important question arises—one not discussed by Morris or her physicians—did City officials and employees actually intimidate, harass and humiliate her as she says, or was this merely a delusion spawned by dementia? If the former, then her claim in reality is mental anguish stemming not from the accident, but from intentional post accident malevolence of City personnel—a claim that may provide the basis for a common law action but not one under the Workers' Compensation Act. If, on the other hand, co-workers and supervisors were not unkind to Morris, then one is faced with determining whether the imagined rancor is a sign of significant mental derangement and, if so, whether there is a causal nexus between it and the 1979 fall. An analysis of the evidence regarding her mental condition as it relates to her claim is, therefore, necessary.

The bulk of the evidence is that the City people really did begin to mistreat her after the first fall in 1976 and continued to do so following the 1978 and 1979 falls—evidence, which if true, would not support a compensation claim. Her psychiatrist vaguely hints in his report, however, that the invidi-

---

1. He noted that wages in lieu of compensation had been paid during this period except for two weeks and one day for which she was awarded $286.

2. She filed a compensation claim for this injury which was pending in the supreme court at the time this case was heard.

ousness was a figment of her imagination by saying the psychometric testing reflected "[e]arly paranoid features."[3] But even if Prosser is suggesting something in the nature of a traumatic neurosis, claimant is not helped because he makes no attempt to connect the "[e]arly paranoid features" to any of her accidental injuries.

Just what did the mind expert conclude? Nothing more than this: "Psychiatric examination confirmed the presence of anxiety and depression with a marked sense of damage to her body image." Then he mentioned the paranoidal results of the psychometric testing and, without saying a word about the etiology of either the anxiety, depression, or paranoia, concluded in the June 20, 1979 report that "[t]his woman is in need of psychiatric treatment and efforts to alleviate the *depressive* features have been instituted . . . ."[4] That is it.

But if the psychiatrist declined to associate any part of Morris' mental condition with her work-related injuries, *general* practitioner Allen was less reluctant to. After learning of Prosser's diagnosis, Allen exaggerated it in a report written ten days later. In it Allen wrote that "He [Prosser] has diagnosed her as having *extremed [sic]* anxiety and depression *over her current circumstances.*"[5] And, he went on, "In my opinion Mrs. Morris remains temporarily and totally impaired secondary to the above described injuries to her left hip, lumbar spine and left ankle, as well as marked anxiety-depression reaction which she is undergoing *secondary to the injury* and its effect on her life at this time."[6]

The term secondary, when used by physicians in the context of a causative connotation, usually refers to that which is immediately derived from something occurring or existing earlier. Thus, as Allen uses the word, we assume he is saying that her anxiety-depression syndrome was derived from the 1979 fall both directly and indirectly. He does not explain in what manner the mishap directly caused the mental problem, but he does hint at its indirect implications by referring vaporously to "its effect on her life at this time."

What all this simmers down to is that at best there exists a reasonable conflict in the evidence regarding the cause of the psychopathy, and at worst there is an absence of factual evidence upon which either a medical expert or the factfinder could predicate a conclusion that the 1979 fall caused claimant's anxiety-depression disorder.

### IV

We hold, therefore, that the trial court did not err in making the findings he made.[7]

The order of August 27, 1979 is affirmed subject to correction of any error which may have been made in connection with the medical bills claimant incurred for treatment of her ankle and back when the matter comes on for further hearing.

BACON, J., concurs.

### SUPPLEMENTAL OPINION ON REHEARING

PER CURIAM:

In her petition for rehearing claimant says this court failed to consider whether the trial court was correct in limiting

---

3. A mental abnormality resembling paranoia; a chronic, slowly progressive personality disorder characterized by systematized delusions of persecution—or grandeur. Dorland's Medical Dictionary.

4. (emphasis ours)

5. (emphasis ours) Prosser said nothing in his report concerning why or about what the patient was apprehensive and depressed, or regarding the intensity of her mental abnormality as being "extreme." In relating the history he received from Morris, he does quote her as telling him that she was "awfully depressed" because she was in pain and in debt—reasons which do not exactly coincide with those stated in her sworn testimony. Whether Prosser considered the historical datum relevant is not disclosed.

6. (emphasis ours)

7. There were some medical bills for back-related treatment that may have been overlooked by the trial judge. If these should have been paid by the City, the court should correct the ruling when the case is heard with regard to the extent of claimant's permanent disability.

temporary total disability to June 22, 1979 and whether further medical treatment had to be allowed. She is correct and the reason for such failure may be attributed to our impression that the main thrust of her forensic effort was toward turning the mental issue around.

The answer to the omitted issues is simply that there was evidence to support the trial court's finding even though the same physician who said temporary total ended June 22, 1979 later changed his mind and said it did not and opined claimant needed an additional eight weeks of treatment. The trial judge was obliged to consider all of the facts and circumstances in evidence—including the testimony of the claimant—in making a finding regarding the terminal date of her temporary total disability. He had three dates from which to choose. He chose one and we have no legal basis for choosing a different one.

And, of course, implicit in the court's order is a finding that further medical treatment was not needed. Such a finding is not without an evidentiary foundation.

Claimant's petition for rehearing is denied.